1  Schiff Hardin LLP
   Bruce A. Wagman (SBN 159987)
2  bwagman@schiffhardin.com
   One Market
3  Spear Street Tower, Suite 3100
   San Francisco, CA  94105
4  Telephone:    415.901.8700
   Facsimile:    415.901.8701
5

6  Molly L. Wiltshire (seeking *pro hac vice* admission)
   mwiltshire@schiffhardin.com
   233 S. Wacker Drive, Suite 7100
7  Chicago, IL 606006
   Telephone:    312.258.5500
8  Facsimile:    312.258.5600

9  Attorneys for Plaintiffs Front Range Equine Rescue, The
   Humane Society of the United States, Marin Humane,
10  Cindy Machado, Humane Society of the Sierra Foothills,
   Rosemary Frieborn, and Return to Freedom
11

12  Kimberly D. Ockene (seeking *pro hac vice* admission)
   kockene@humanesociety.org
   Jonathan R. Lovvorn (SBN 187393)
13  jlovvorn@humanesociety.org
   1255 23rd Street NW, Suite 450
14  Washington, DC 20037
   Telephone:    202.452.1100
15  Facsimile:    301.548.7700

16  Attorneys for Plaintiff The Humane Society of the United
   States
17

18                **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20                 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 21  FRONT RANGE EQUINE RESCUE, THE HUMANE SOCIETY OF THE | Case No. |
| 22  UNITED STATES, MARIN HUMANE, CINDY MACHADO, HUMANE | |
| 23  SOCIETY OF THE SIERRA FOOTHILLS, ROSEMARY | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| 24  FRIEBORN, and RETURN TO FREEDOM, | |
| 25                    Plaintiffs, | Administrative Procedure Act Case |
| 26  v. | |
| 27  VICKI CHRISTIANSEN, in her official | |
| 28  capacity as Chief of the United States | |

1  Forest Service; GEORGE "SONNY"
2  PERDUE, in his official capacity as
   Secretary of the United States Department
3  of Agriculture; RANDY MOORE, in his
   official capacity as Regional Forester for
4  the Pacific Southwest Region, US Forest
   Service; and AMANDA MCADAMS, in
5  her official capacity as Forest Supervisor of
   the Modoc National Forest, US Forest
6  Service,

                    Defendants.

7

8          Front Range Equine Rescue, The Humane Society of the United States, Marin Humane,

9   Cindy Machado, the Humane Society of the Sierra Foothills, Rosemary Frieborn, and Return to

10  Freedom (collectively, "Plaintiffs" and each a "Plaintiff"), for their Complaint against Vicki

11  Christiansen, in her official capacity as Chief of the United States Forest Service ("USFS" or

12  "Forest Service"); George "Sonny" Perdue, in his official capacity as Secretary of the United States

13  Department of Agriculture ("USDA"); Randy Moore, in his official capacity as Regional Forester

14  for the Pacific Southwest Region, USFS; and Amanda McAdams, in her official capacity as Forest

15  Supervisor of the Modoc National Forest, USFS (collectively, "Defendants" and each a

16  "Defendant"), state as follows.

17                              **<u>INTRODUCTION</u>**

18         1.      The Forest Service has abruptly and inexplicably reversed the long-standing policy

19  of two different federal agencies concerning the disposal of wild horses removed from federal

20  public lands, all but guaranteeing that federally protected wild horses will now be slaughtered for

21  human consumption in violation of the California Penal Code and multiple federal laws, as well as

22  the expressed will of Congress and the American people.

23         2.      For decades, the two agencies charged with managing and protecting wild horses,

24  the USDA, through the Forest Service, and the Department of the Interior, through the Bureau of

25  Land Management (BLM), have implemented a policy that prohibits selling wild horses to buyers

26  who would have any plans or expectation that the horses would be slaughtered for human

27  consumption or sold to a commercial slaughter operation.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 2 -                                              COMPLAINT

3.     Under that policy, wild horses permanently removed from public rangelands had a few possible fates: (1) adoption to a qualified individual, who agreed not to use or transfer the horse in any way that would end up with the horse being slaughtered for human consumption; (2) sale "with limitation," meaning to a buyer who agreed not to use or transfer the horse in any way that would end up with the horse being slaughtered for human consumption; or (3) confinement to an agency-designated long-term holding facility.  Beyond those three possibilities, wild horses could *not* be sold "*without limitation*," meaning to a buyer who could slaughter the horses for human consumption or who had any intention, plan, or expectation that the horses would be transferred or used for such commercial purposes.

4.     The Forest Service is in the midst of rounding up approximately one thousand wild horses from the Devil's Garden Plateau Wild Horse Territory ("Devil's Garden") in the Modoc National Forest in California and removing them from the range.  After a short period when the wild horses could be adopted, the Forest Service has announced that any older horses or horses not successfully adopted will be offered for sale "without limitation."  Sales of wild horses to commercial slaughter are anticipated to begin as early as January 2019.

5.     The Forest Service's policy change allowing sales "without limitation" has been announced only in the last few weeks, and only informally through press releases, media comments, and e-mail correspondence.  There has been no notice-and-comment or administrative review possibility around this radical policy change, and no publicly-announced environmental review or analysis was ever conducted by USFS for any action that addressed the potential impacts of selling federally protected wild horses into the commercial slaughter pipeline.

6.     The agency's drastic, surprising policy reversal has ignited concerns from federal and state elected officials and from members of the public, the majority of whom are opposed to seeing these iconic symbols of the American West sold so that they can become dinner on foreign plates.

7.     The Forest Service's unprecedented, unreasoned, and undocumented decision violates basic tenets of the Administrative Procedure Act ("APA"), risks causing significant

COMPLAINT

environmental impacts from wild horse removal actions that have never been considered under the National Environmental Policy Act ("NEPA"), violates the agency's own planning directives and management documents under the National Forest Management Act ("NFMA"), and disregards the purpose and spirit of the Wild Free-Roaming Horses and Burros Act ("Wild Horse Act").

8.      Plaintiffs bring this action to enjoin Defendants from carrying out the agency's new policy and taking any further action concerning wild horses from Devil's Garden except in full compliance with all federal laws, to enjoin Defendants to restore the status quo policy of only selling wild horses "with limitation," absent lawful rulemaking altering that policy, and requiring Defendants to conduct proper NEPA analysis, with public participation, if there are going to be any wild horse sales without limitation resulting from the Devil's Garden management action.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

10.      Venue is proper in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C), because Plaintiff Marin Humane maintains its principal place of business in this district, and thus resides in this judicial district, and Plaintiff Captain Cindy Machado resides in this judicial district, and there is no real property involved in this action. *Id*. § 1391(c)(2).

## INTRADISTRICT ASSIGNMENT

11.      Pursuant to Civil Local Rules 3-5, 3-2(c), and 3-2(d), this action is properly assigned to the San Francisco Division of this Court because Plaintiff Marin Humane resides in and has its principal place of business in Marin County, and Plaintiff Cindy Machado resides in Sonoma County.

## PARTIES

12.      Plaintiff Front Range Equine Rescue (FRER) is a 501(c)(3) nonprofit organization incorporated in Colorado. Established in 1997, FRER is dedicated to stopping cruelty and abuse of horses through rescue and rehabilitation. FRER is actively involved in the rescue, rehabilitation,

and adoption to good homes of domestic and wild horses, and in educational efforts regarding responsible horse ownership and wild horse roundups.  FRER has assisted thousands of horses through its rescue and educational programs.

13.     For over twenty years, one of FRER's primary goals has been to protect wild horses on federal public lands, by ensuring they are not subject to abuse, harassment, or mismanagement at the hands of the federal agencies charged with ensuring their long-term survival and presence on those lands, as well as to ensure the well-being of those horses captured and removed from federal lands and sent to long-term holding corrals or transferred from USFS to (usually private) third parties.

14.     FRER's "Save the Wild Horses" campaign is dedicated to the protection of all wild horses, and includes regular provision of information to the public and partnerships with other wild horse groups.

15.     One of FRER's core activities is the rescue and rehabilitation of abused, neglected, and abandoned horses, whether domestic or wild.  FRER puts a substantial amount of its resources into this work.  The majority of FRER's rescue horses would have been sent to slaughter but for FRER's rescue of them.

16.     FRER also actively engages in education regarding the safe rehoming of horses who are in need of new homes, and FRER steps in to crisis situations such as natural disasters and large animal cruelty rescues, whenever it can.

17.     In order to keep its supporters informed, FRER expends significant time and resources investigating, monitoring, and reporting on the federal agencies' wild horse programs.

18.     FRER has as a primary goal the prevention of horse slaughter for human consumption, and the education of the public about the dangers of horse meat for the public and the environment, as well as the cruelty inherent in horse slaughter operations.  This is a national campaign of FRER's, which includes taking horses from auction yards who are on the way to slaughter, as well as providing ongoing information and consultation nationwide on the various issues relating to the slaughter of horses for human consumption.

Schiff Hardin LLP
Attorneys At Law
San Francisco

COMPLAINT

19.   FRER, along with other organizations, successfully sought judicial intervention when USDA planned to send federally funded meat inspectors to facilities in several states that intended to slaughter horses for human consumption.

20.   Until recently, since neither the US Department of the Interior Bureau of Land Management (BLM) nor USFS has had any intentions or plans to sell wild horses "without limitations" to kill-buyers, resulting in the horses' slaughter, FRER had not focused on monitoring or investigating the agencies' sales "without limitation" of wild horses, and instead could focus on rescuing horses on their way to slaughter.

21.   Since USFS confirmed it would sell some of the Devil's Garden wild horses without limitation, FRER has been diverting its limited resources to investigate, evaluate, monitor, and assess the USFS's policy change and decisions challenged in this action.  FRER has used its resources that it would have used for other programs, if it were not for Defendants' illegal actions in authorizing and preparing to engage in sales without limitation.  Because of USFS's stated policy change, FRER has had to focus its attention on Defendants' illegal actions, and has taken its resources away from other core FRER programs, including the Save the Wild Horses campaign.

22.   FRER will continue to monitor, evaluate, and investigate USFS's conduct with respect to selling wild horses into slaughter, and will continue to provide reports to its supporters about that conduct.  These actions will continue to divert FRER's limited resources from FRER's other programs, including direct rescue work and assistance with rehoming and rescue of wild and domestic horses found in abusive situations.

23.   FRER has been forced to cut back on its rescue and rehabilitation programs because of USFS's decision to sell wild horses without limitation.  Because of USFS's policy change, FRER has been and continues to be forced to expend its limited resources investigating and tracking Defendants' unlawful actions.  The resources that have been used in this regard would otherwise have been used for FRER's other campaigns and organizational goals, including its efforts to keep wild horses free from roundups and long-term confinement in BLM corrals, its adoptions of rescued horses or formerly wild horses to good homes, its sanctuary program permanently adopting and

caring for horses, and its educational efforts regarding wild horse roundups, the cruelty of horse slaughter, and responsible horse ownership.

24.     FRER is uniquely poised to challenge Defendants' policy change to sell wild horses into slaughter because of its particular focus on horses who are abused, neglected, abandoned, or dumped into the slaughter pipeline.  The challenged agency actions will further increase the burden on FRER to rescue wild horses when they are sold by Defendants without limitation.

25.     Defendants' actions challenged here impede FRER's programmatic work and frustrate its ability to pursue its organizational goals for several reasons.  For instance, the change in policy will result in further inhumane treatment of wild horses and many more wild horses going to slaughter, which requires FRER to divert its limited organizational and programmatic resources to continue to monitor these activities. These resources would otherwise be spent on programmatic rescue and educational activities to protect wild and domestic horses, in furtherance of FRER's goals.

26.     There is a direct conflict between the Defendants' conduct – the inhumane, unnecessary sale for slaughter of wild horses – and FRER's mission of protecting wild horses, both on the range and after they have left the range.

27.     Defendants' actions will also cause FRER to divert its programmatic and organizational resources to prevent an expansion of the sales without limitation of wild horses. FRER will be forced to expend additional resources investigating, evaluating, and educating the public about the USFS's change in policy and future planned activities, which are both illegal and inhumane.  Since these resources would otherwise be spent on rescue, rehabilitation, and education, Defendants' unlawful conduct directly impedes FRER's activities, and causes a significant drain on its resources and time.

28.     The Defendants have inflicted and will continue to inflict economic injury on FRER, by changing to a policy of selling wild horses that violates federal law and irresponsibly deals with wild horses.

29.     FRER is directly impaired in its ability to engage in activities that protect domestic and wild horses, and has had to cut back on daily operations for its other programs, because of Defendants' policy change.

30.     FRER has been, and will continue to be, forced to divert money and resources from other programs and projects in order to engage in activities that would otherwise not be necessary, were it not for Defendants' decision to sell wild horses without limitation.

31.     But for Defendants' conduct challenged here, FRER would have devoted its time, resources, and funds to other organizational projects, such as public educational efforts on wild horse management, including the use of *porcine zona pellucida* (PZP), and the development of other long-term maintenance options for America's wild horses.

32.     FRER's injuries will be redressed if it prevails in this action, because if the policy permitting sale without limitation is stopped, FRER will not need to continue to monitor and track the sales of wild horses from Devil's Garden and will not need to dedicate its resources towards educating the public about this action specifically.

33.     The Humane Society of the United States ("The HSUS") is a non-profit organization that promotes the protection of all animals.  The HSUS maintains its headquarters in Washington, DC and is the largest animal protection organization in the United States, with millions of members nationwide, many of whom are specifically dedicated to the protection of wild horses.  The HSUS actively advocates against practices that injure or harm horses — both wild and domestic — and actively opposes the slaughter of horses.  The HSUS has advocated for the passage of state laws that ban horse slaughter or govern the treatment and transportation of horses sold for slaughter within their borders, and has worked at the federal level to support legislation that would ban the sale or transport of horses for slaughter and to ensure that protective language is included in appropriations packages that prevents wild and domestic horses from being sent to slaughter.  In addition, HSUS was a plaintiff, along with Plaintiffs FRER, Marin Humane, and Return to Freedom, in a lawsuit that successfully sought judicial intervention when USDA planned to send

COMPLAINT

federally funded meat inspectors to facilities in several states that intended to slaughter horses for human consumption.

34.     For years, HSUS has also advocated for the protection of wild horses and burros, and works collaboratively with many other public interest organizations and federal and state government agencies to protect and humanely manage population levels.  One of HSUS's main goals in this regard is to ensure that no wild horse or burro is ever sent to slaughter by providing the agencies with tools to manage population numbers that negate the need for drastic measures such as sale for slaughter.  As part of its advocacy on behalf of wild horses, the HSUS strongly supports fertility control tools, such as immunocontraception vaccines, as a humane means of managing populations where government agencies have determined that active management is needed (although HSUS may disagree with that determination).  One of the tools that HSUS promotes is the use of immunocontraceptive vaccines containing the ingredient *porcine zona pellucida* ("PZP"), such as Zonastat-H.  HSUS holds the registration for Zonastat-H under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA").  For over twenty years, the HSUS has expended financial and personnel resources to develop Zonastat-H, and worked closely with partners in the scientific field who were striving to demonstrate the effectiveness of Zonastat-H on the range, refine the vaccine manufacturing process, and develop training standards.  In recent years, HSUS invested its time and resources to obtain the registration for Zonastat-H because the efficacy of the tool has been proven, and the organization firmly believes that the use of immunocontraception has the potential to help control the wild horse and burro population so that roundups — which are stressful and often injure horses — are less frequent, and in certain areas can be phased out altogether.

35.     The Defendants' decision to allow the unrestricted sale of wild horses from the Devil's Garden WHT without limitation harms HSUS in several important respects.  First, HSUS's campaign to prevent the slaughter of wild horses is substantially infringed by the Forest Service's decision to sell horses without limitation (*i.e.*, without prohibiting horses from being sent to slaughter).  Consistent with HSUS's advocacy efforts described above, it has been the policy of all

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

federal agencies managing wild horses only to sell wild horses *with* limitations prohibiting horses from being sent to slaughter.  The Forest Service's decision to abruptly change its policy therefore directly undermines the continuing success and overall efficacy of HSUS's advocacy efforts with respect to protection and humane management of wild horses.

36.     The Forest Service's decision frustrates HSUS's ability to protect the horses within the National Forest from harm and to ensure that no horses are sent to slaughter, and causes HSUS to divert resources to fighting this decision rather than using these resources for other advocacy projects.  HSUS has a specific program that advocates for protection and humane management of wild horses and burros, and staff expend time and efforts educating the public on the plight of wild horses and burros, raising awareness of fertility control tools, meeting with federal and local officials on the creation of fertility control programs to manage wild horse populations, and working with the scientific community on the implementation of currently available tools and the creation of additional fertility control tools.  The Forest Service's action has required that HSUS shift its advocacy focus away from promoting humane management practices to opposing the Forest Service's selling wild horses without limitations.  HSUS has had to communicate with constituents, other public interest groups, lawmakers, and the Defendants about the agency's decision, as well as undertake legal and factual analyses, and will need to continue to do so until this matter is resolved.  HSUS's constituents know that opposition to horse slaughter and advocacy for wild horses are both central to HSUS's advocacy work, and they rely on HSUS to engage in these matters.

37.     In addition, HSUS's ability to expand the use of Zonastat-H as a humane method of managing wild horse populations on the range is frustrated by the Forest Service's decision to allow the sale of wild horses without limitation.  If the Forest Service is able to sell numerous wild horses easily because of the lack of any restriction on how those horses may be used, then it may have less incentive to work with HSUS and other organizations and scientific partners to implement fertility control programs to manage wild horse and burro populations through the use of Zonsastat-H.  This harms HSUS's ability to advocate for a management tool that is more protective of the horses, and

also limits HSUS's ability to make use of its investment in the development and registration of Zonastat-H.

38.     These injuries are directly caused by the Forest Service's decision to allow the sale of Devil's Garden horses without limitation, and will be redressed if the Forest Service's decision to allow such sale is set aside, because the agency will then not be allowed to sell the wild horses for slaughter without further process.

39.     Plaintiff Marin Humane ("Marin Humane") is a 501(c)(3) nonprofit organization located in Novato, California.  Marin Humane was founded over 100 years ago to protect and advocate for animals.  Marin Humane offers refuge, rehabilitation, and support services to more than 10,000 animals each year.  Marin Humane has its principal place of business in Novato, Marin County, California.

40.     Pursuant to Marin County Ordinances 8.04.110 and 8.04.120, Marin Humane has been appointed as the animal services agency for the county and is authorized to appoint its employees as Animal Services Officers.  All Animal Services Officers are deemed to be "peace officers" and are authorized to enforce all animal-related laws of the county and the state of California.

41.     Marin Humane also has an active anticruelty and advocacy program and routinely supports legislation directed at reducing cruelty to all animals.  Marin Humane has supported and continues to support the passage of laws banning horse slaughter, based on Marin Humane's policy against that practice.  Marin Humane also works with local and state animal control groups, monitoring activity relating to violations of the criminal laws related to animals.

42.     Marin Humane monitors and weighs in on national issues and has a special focus on Marin County and its residents.  Marin Humane investigates horse cruelty complaints and assists individuals with guidance and advice as to how to best care for their horses, including how to prevent horses from being lost, stolen, or sold to "kill-buyers" at auction.

43.     Marin Humane has actively supported the passage of state laws that ban horse slaughter and govern the treatment and transportation of horses sold for slaughter.  Marin Humane

promotes and supports a mission of anticruelty for all animals, and for that reason is opposed to the slaughter of horses.

44.     Marin Humane has been actively involved in surveillance and investigations of local livestock auctions where horses were being sold to kill-buyers for slaughter.  Marin Humane has also rescued horses destined for slaughter, and has counseled the public in order to prevent the sale of horses to slaughter, and has worked with other equine rescue groups in order to prevent horses from going to slaughter.

45.     Marin Humane has been involved in training animal control officers, animal services officers, police officers, humane officers, and other students in the application of state statutes addressing horse slaughter issues.

46.     Marin Humane was a plaintiff, along with Plaintiffs FRER, HSUS, and Return to Freedom, that successfully sought judicial intervention when USDA planned to send federally funded meat inspectors to facilities in several states that intended to slaughter horses for human consumption.

47.     The ability of Marin Humane to engage in educational, legislative, and advocacy activities with respect to horse protection is injured by Defendants' failure to comply with NEPA. Without the required environmental analysis, and response to public comments, Defendants have prevented Marin Humane from learning what, if any, environmental effects information USDA considered prior to USDA undertaking the decision to sell Devil's Garden horses without limitation, thereby inhibiting Marin Humane's efforts to communicate with its supporters, so that they may in turn contact USDA, other agencies, and their elected representatives to advocate for the humane treatment of horses and other animals and the protection of the environment from horse slaughter contamination.

48.     Plaintiff Captain Cindy Machado is, and was at all times relevant to the facts in the Complaint, an individual residing in Sonoma County, and a citizen of California.  Captain Machado is a law enforcement officer employed by Marin Humane, and is the Director of Animal Services for Marin Humane.  Captain Machado is charged with enforcing the anti-cruelty laws in Marin

County, and has the powers of an animal control officer and may exercise the powers of arrest of a peace officer and the power to serve warrants.

49.     Captain Machado has been an animal services officer since 1984, and has been involved with Marin Humane since that time.  She is currently in charge of administering the animal services contract for Marin County and all of its cities as well as supervising the Animal Services Division of Marin Humane.

50.     Captain Machado coordinates and supervises the Basic and Advanced Animal Law Enforcement Academies held at Marin Humane in partnership with Santa Rosa Junior College.

51.     Captain Machado is routinely called on for her expertise in animal issues around the country including animal cruelty/neglect, animal and human violence issues, captive wildlife, animal hoarding, legislation, and other serious animal-related investigations.

52.     Captain Machado is primarily responsible for identifying violations of the California anti-cruelty laws, investigating such violations, and taking action to secure the seizure of animals subjected to cruelty, as well as the prosecution of individuals in violation of those laws.

53.     On information and belief, anyone who purchases Devil's Garden wild horses "without limitation" is almost certainly intending to sell those horses into the commercial market of horses, and that those horses will be slaughtered in foreign slaughterhouses and then sold as horse meat.

54.     Captain Machado is aware of the imminent and virtually guaranteed violations of California Penal Code § 598c, and the potential violation of California Penal Code § 598d, that will occur if the Forest Service undertakes sale of the Devil's Garden horses "without limitation."

55.     Captain Machado's duties as a law enforcement officer for the County of Marin will require her to divert her resources to determine if Devil's Garden horses sold without limitation are being transported through, or held, in Marin County, solely because of the Forest Service's decision to sell the Devil's Garden horses without limitation.

56.     If the Forest Service begins selling wild horses without limitation, it will impact Captain Machado's ability to carry out her other duties for Marin Humane, because of the time,

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

energy, and resources that will be required to try to identify individuals who have purchased Devil's Garden horses from the Forest Service and are transporting those horses with the knowledge that they will be slaughtered for human consumption.

57.     If the Forest Service is prevented from selling the Devil's Garden horses without limitation, Captain Machado's injuries stated here will be remedied, because she will not be forced to try to identify, investigate, and assist in the arrests and prosecution of individuals violating California Penal Code §§ 598c and 598d, solely as a result of the Forest Service's decision to sell the Devil's Garden horses without limitation.

58.     Plaintiff the Humane Society of the Sierra Foothills (HSSF) is a 501(c)(3) nonprofit, and a certified California society for the prevention of cruelty to animals, pursuant to California Corporations Code §§ 10400 *et seq.*  HSSF was incorporated in 2008, and its overall mission is to maintain an organization of persons dedicated to stopping and preventing the abuse and neglect of animals by enforcing California's anti-cruelty laws.  It also works to protect and enhance the quality of life for animals in Placer County and surrounding areas.

59.     Since 2008, HSSF has been enforcing California's anti-cruelty laws, and been investigating instances of animal cruelty of which HSSF has been informed.

60.     HSSF has been involved in the investigation of violations of California's anti-cruelty laws involving wild horses.

61.     HSSF fulfills its mission with activities that include enforcing current animal welfare laws via court-certified Humane Officers; providing rescue operations and foster-to-adoption programs; assisting animal owners to properly deal with specific animal conditions that need attention; and educating citizens as to responsible pet ownership.

62.     HSSF is authorized to file complaints against any person for violation of the anti-cruelty laws.  Cal. Corp. Code § 10404.

63.     HSSF's investigators and/or Humane Officers respond to animal neglect, cruelty, or abuse complaints; work with animal owners to resolve issues to benefit their animal(s); and are successful in the vast majority of cases.  If/when cooperation or resolution efforts fail, and animal(s)

neglect, cruelty, or abuse continues, HSSF and its Humane Officers may execute search warrants and seize animals, so that prosecution by the District Attorney may proceed.

64.     HSSF also oversees the rescue of animals subjected to cruelty and ensures they receive needed veterinary treatment, are rehabilitated, and eventually are adopted to responsible owners.  HSSF has been involved in rescue cases that have included puppy mill operations, animal hoarding, and neglect of wild horses, domestic horses, dogs, cats, goats, llama/alpacas, pigs, chickens, exotic birds, and other farm animals.

65.     Because of the Forest Service's plans to sell wild horses from Devil's Garden without limitation, HSSF will be dedicating resources to investigation and identification of individuals who purchase those horses and may be intending to sell the horses into the commercial market with the intention of the horses ending up in slaughterhouses to be turned into horse meat for human consumption.

66.     HSSF's other programs will be negatively impacted if HSSF is required to devote its limited time, energy, and resources to the identification of kill-buyers who may be buying Devil's Garden wild horses, the transportation routes to slaughter for these horses, and the further investigation of violations of California Penal Code §§ 598c and 598d.

67.     Plaintiff Rosemary Frieborn is, and was at all times relevant to the facts in the Complaint, an individual residing in Placer County, and a citizen of California.  Mr. Frieborn has been a certified Level 2 humane officer with the Humane Society of the Sierra Foothills (HSSF) since 2009.  She has a degree in Veterinary Technology and has been a California State licensed registered veterinary technician since 2005.  In 2014, she received a degree in the Administration of Justice with an emphasis on Law Enforcement.  She is a graduate of the National Animal Control Association Academy, the State Humane Association's Basic Academy, and as required by California Corporations Code 14502, has over 800 hours in continuing education related to the powers and duties of a humane officer.

68.     As a Level 2 Humane Officer pursuant to California Corporations Code § 14502, Ms. Frieborn is authorized to "exercise the powers of a peace officer at all places within the state

in order to prevent the perpetration of any act of cruelty upon any animal" and to "make arrests for the violation of any penal law of this state relating to or affecting animals in the same manner as any peace officer and may serve search warrants." *Id*. § 14502(h)(2).

69.     As a humane officer of HSSF, Ms. Frieborn is primarily responsible for identifying violations of the California anti-cruelty laws, investigating such violations, and taking action to secure the seizure of animals subjected to cruelty, as well as the prosecution of individuals in violation of those laws.

70.     Ms. Frieborn has specialized experience with wild horses in California, having been involved in investigations of wild horses removed from the rangeland by a federal agency.  She has also visited the Litchfield holding facility, where many of the Devil's Garden wild horses may be brought after their capture.

71.     On information and belief, anyone who purchases Devil's Garden wild horses "without limitation" is almost certainly intending to sell those horses into the commercial market of horses, and that those horses will be slaughtered in foreign slaughterhouses and then sold as horse meat.

72.     Ms. Frieborn is aware of the imminent and virtually guaranteed violations of California Penal Code § 598c, and the potential violation of California Penal Code § 598d, that will occur if the Forest Service undertakes sale of the Devil's Garden horses "without limitation."

73.     Ms. Frieborn's duties as a humane officer, in her position with HSSF, will require her to undertake extensive investigations, to employ other investigators, and to seek out violators of California Penal Code §§ 598c and 598d, solely as a result of the Forest Service's decision to sell the Devil's Garden horses without limitation.

74.     If the Forest Service begins selling wild horses without limitation, it will negatively impact Ms. Frieborn's ability to carry out her other duties for HSSF, because of the time, energy, and resources that will be required to try to identify individuals who have purchased Devil's Garden horses from the Forest Service and are transporting those horses with the knowledge that they will be slaughtered for human consumption.

75.     If the Forest Service is prevented from selling the Devil's Garden horses without limitation, Ms. Frieborn's injuries stated here will be remedied, because she will not be forced to try to identify, investigate, and assist in the arrests and prosecution of individuals violating California Penal Code §§ 598c and 598d, solely as a result of the Forest Service's decision to sell the Devil's Garden horses without limitation.

76.     Founded in 1997, Plaintiff Return to Freedom is a non-profit wild horse conservation organization dedicated to preserving the freedom, diversity and habitat of America's wild horses through sanctuary, education, advocacy and conservation while enriching the human spirit through direct experience with the natural world.

77.     In 2007, Return to Freedom saved the lives of four horses who were about to be slaughtered at the Cavel slaughterhouse in DeKalb, Illinois.  Return to Freedom brought these "miracle horses" to the Lompoc sanctuary, which became their permanent home.  Return to Freedom and its supporters are devoted to these and other horses who have been obtained while en route to slaughter.

78.     Return to Freedom's permanent equine residents include domestic and former wild horses who were on their way to slaughter or vulnerable to the slaughter pipeline but for the group's rescue of the horses, who now live permanently at Return to Freedom's sanctuaries in four California locations.

79.     Return to Freedom supports the enactment of legislation that would end the slaughter of American horses for food, and the transport of horses for slaughter.  Return to Freedom and its supporters remain heavily invested in ensuring that wild horses not be sent to slaughter.

80.     Return to Freedom was a plaintiff, along with Plaintiffs FRER, HSUS, and Marin Humane, that successfully sought judicial intervention when USDA planned to send federally funded meat inspectors to facilities in several states that intended to slaughter horses for human consumption.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

81.     Return to Freedom was a plaintiff that successfully challenged USDA's issuance of a flawed environmental assessment and decision record concerning the Forest Service's management of the Devil's Garden wild horses.

82.     Return to Freedom has developed a unique, nationally respected voice on policy issues by advocating for humane, science-based alternatives to wild horse management rooted in its own hands-on experience with 500 wild horses and 42 burros and its focus on maintaining family bands and herd groups.  Return to Freedom has implemented a successful fertility control program since 2000 with a 91% efficacy rate.

83.     The California-based nonprofit organization was formed as a model to explore natural herd management and viable on-the-range management solutions, as alternatives to traumatic and costly wild horse roundups.

84.     Protecting the wild horses in Devil's Garden and educating the public are prime objectives of Return to Freedom's mission.  The organization is expanding its educational program, and Devil's Garden has been identified as a key classroom on the range for its program.

85.     In addition to national advocacy and educational programs, Return to Freedom operates the American Wild Horse Sanctuary as a model for minimally intrusive management solutions for wild horses that can be applied on the range.  The sanctuary currently houses over 500 wild horses and burros at four California locations and focuses on keeping wild horse family and bonded social bands intact at the sanctuary.

86.     Return to Freedom provides educational programs that attract visitors of all ages including university students, photographers, writers, and others to its sanctuary locations and on western rangelands, including a leased pasture in Alturas, California, adjacent to the Devil's Garden Plateau Wild Horse Territory, where 200 wild horses are located.

87.     As a California-based organization, Return to Freedom has a particular interest in Devil's Garden, which is home to the last large herd of wild horses in the state.  Return to Freedom has been involved in past litigation involving Devil's Garden and as such has worked to keep its

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

supporters aware of the ongoing management of wild horses at Devil's Garden, including opportunities for supporters to participate in the ongoing planning process.

88.     In 2016, Return to Freedom employed a photographer to document a helicopter roundup of Devil's Garden wild horses and remained in contact with the Forest Service about concerns that arose during that roundup.

89.     Through the years, Return to Freedom has expended extensive resources, and diverted funds from its other programs, in order to monitor the Forest Service's treatment of the wild horses in Devil's Garden.

90.     Return to Freedom has also continued to update its supporters about the well-being of wild horses taken to holding facilities and informed them about a subsequent release of un-adopted horses that went back onto the wild horse territory.

91.     In 2018, Return to Freedom has regularly updated its supporters on the planned roundup of wild horses at Devil's Garden, as well as the sale and adoption of captured horses.

92.     As an organization that opposes horse slaughter and transportation of horses for slaughter, Return to Freedom has devoted considerable resources not only to advocating against the unrestricted sale of captured wild horses from Devil's Garden but in marshaling potential buyers and adopters of captured wild horses, transportation for those horses, and financial support from donors to prevent captured wild horses from being purchased by kill-buyers.

93.     The funds, time, and effort placed into reporting and finding homes for the Devil's Garden wild horses past and present, organizing their placement, and documenting their treatment during roundups, has caused Return to Freedom to use resources that would have otherwise been spent on its other programs, including adoption, educational programs, and donor development to benefit the wild horses and burros already in Return to Freedom's care, among other projects important to the future of the organization.

94.     Return to Freedom provides wild horse educational programs that attract an international clientele, with the classes providing students with opportunities to view wild horses in the wild, including in California.

95.     Return to Freedom's president Neda DeMayo enjoys viewing, photographing, and studying wild horses throughout the west, including in the Devil's Garden area.

96.     Ms. DeMayo has visited Devil's Garden multiple times and has plans to visit in the near future.  She enjoys viewing the wild horses in Devil's Garden and showing them to her guests.  In the past, she has toured Devil's Garden with work study participants to assess range, water, and wild horse conditions and to observe natural behaviors.

97.     Devil's Garden is the last large wild horse herd in California, and so Return to Freedom and Ms. DeMayo have a special interest in protecting these horses on their range, and ensuring their humane treatment if they are removed.

98.     Defendant Vicki Christiansen is Chief of the Forest Service and is sued in that capacity.  She is charged with ensuring the Forest Service's compliance with its environmental obligations, and she has ultimate responsibility for the decision to sell federally-protected wild horses "without limitation," including to buyers who will slaughter the wild horses for human consumption.

99.     Defendant George "Sonny" Perdue is Secretary of the USDA, and is sued in that capacity.  Because the USFS is an agency within USDA, Defendant Perdue has ultimate responsibility for the decisions of the USFS, including its decision to sell federally-protected wild horses "without limitation," including to buyers who will slaughter the wild horses for human consumption.

100.    Defendant Randy Moore is Regional Forester for the Pacific Southwest Region of the USFS, and is sued in that capacity.  He is charged with overseeing all decisions issued by national forest officials in the Pacific Southwest Region of the Forest Service, including in the Modoc National Forest.  Accordingly, he has ultimate responsibility for the decision of the Modoc National Forest to sell federally-protected wild horses "without limitation," including to buyers who will slaughter the wild horses for human consumption.

101.    Defendant Amanda McAdams is Forest Supervisor of the Modoc National Forest, USFS, and is sued in that capacity. She is charged with issuing all decisions on behalf of the Modoc

National Forest, and thus has ultimate responsibility for its decision to sell federally-protected wild horses "without limitation," including to buyers who will slaughter the wild horses for human consumption.

## LEGAL FRAMEWORK

### CALIFORNIA PENAL CODE SECTION 598C

102.   In 1998, California voters passed a ballot measure known as Proposition 6, which made it unlawful in California to possess or transfer horses where the possessor or transferor knew or should have known that the horse will be killed for human consumption.

103.   Proposition 6 is codified in California Penal Code § 598c, which specifically makes it "unlawful for any person to possess, to import into or export from the state, or to sell, buy, give away, hold, or accept any horse with the intent of killing, or having another kill, that horse, if that person knows or should have known that any part of that horse will be used for human consumption." Cal. Penal Code § 598c.

104.   California Penal Code 598d further states that "horsemeat may not be offered for sale for human consumption" in California. Cal. Penal Code § 598d.

105.   The California Penal Code is consistent with the will of the people of California that horses should be treated humanely and should not be slaughtered for human consumption. It is also consistent with the policy behind the Wild Horse Act that wild horses be protected and that management of the wild horses shall be at the "minimal feasible level," and the will of Congress as expressed in annual appropriations language prohibiting any funds made available to the Department of Interior from being used for the sale of wild horses that results in their processing into commercial products.

### ADMINISTRATIVE PROCEDURE ACT (APA)

106.   The APA provides for judicial review of final agency action for persons adversely affected or aggrieved by the agency action. 5 U.S.C § 702.

107.   The APA authorizes this reviewing Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (C), and (D).

108.   Under the APA, courts "shall…hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).  An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

109.   An agency action is also arbitrary and capricious under the APA if the agency diverges from prior policies and standards without providing a reasoned explanation for why it changed course.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### NATIONAL ENVIRONMENTAL POLICY ACT

110.   Under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Federal Government is continually responsible to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations; assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings; attain the widest range of beneficial uses of the environment without . . . undesirable and unintended consequences; [and] preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice."  42 U.S.C. § 4331(b)(1)-(4).

111.   NEPA's mandates include "[promoting] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man" and

"[establishing] a Council on Environmental Quality" ("CEQ") charged with "formulat[ing] and recommend[ing] national policies to promote the improvement of the quality of the environment." 42 U.S.C. §§ 4321, 4342.   NEPA aims to foster better decision making and inform public participation for actions that affect the environment.

112.   The Forest Service has adopted procedures for compliance with NEPA and the CEQ regulations, which "supplement[] and do[] not lessen the applicability of the CEQ regulations," and which are "to be used in conjunction with the CEQ regulations and USDA regulations."  36 C.F.R. § 220.1

113.   The CEQ regulations implementing NEPA mandate that "[f]ederal agencies shall to the fullest extent possible . . . [u]se the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects . . . upon the quality of the human environment," and "[u]se all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."  40 C.F.R. §§ 1500.2(a), (f).

114.   CEQ regulations define the term "major federal action:"

> "Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility . . . (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals. . . . (b) Federal actions [include] . . . (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive[;] (4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

40 C.F.R. § 1508.18.

115.   CEQ regulations explain that evaluating whether an action "significantly" affects the environment requires considerations of both "context" and "intensity."  40 C.F.R. § 1508.27. For "context," the agency must consider the effects on society as a whole, the affected region, the affected interests, and the locality.  40 C.F.R. § 1508.27(a).  For "intensity" or severity of the

environmental impact, the agency must take into account multiple considerations, among them: "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment;" "[t]he degree to which the proposed action affects public health or safety; "[t]he degree to which the effects on the environment are likely to be highly controversial;" "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;" the degree to which the action may establish a precedent for future actions with significant effects; and "[i]mpacts that may be both beneficial and adverse.  A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial."  40 C.F.R. § 1508.27(b).

116.    "Effect" is defined in CEQ regulations to encompass both direct and indirect effects and impacts, including but not limited to ecological, aesthetic, historic, cultural, economic, social, or health effects, whether direct, indirect, or cumulative.  40 C.F.R. § 1508.8.

117.    NEPA requires all federal agencies to prepare a "detailed statement" regarding all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  This statement is referred to as the Environmental Impact Statement ("EIS").

118.    An EIS ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  *Id.*

119.    Where the significance of environmental effects is unclear, the agency may first prepare an "environmental assessment" ("EA"), which must "provide sufficient evidence and analysis for determining whether to prepare an EIS or a finding of no significant impact (FONSI)."  40 C.F.R. § 1508.9(a).

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

120.   Although Supplemental Information Reports ("SIR") are not mentioned in NEPA or its regulations, courts have permitted their use in an agency's determination of whether new information or changed circumstances require the preparation of a supplemental EA or EIS. However, if the environmental impacts resulting from the new information or changed circumstances are significant or uncertain, as compared with the original action's impacts, a supplemental EA is required, and a SIR is not sufficient.

121.   Federal agencies must carefully consider relevant "detailed information concerning significant environmental impacts" and share that information with the public in the Environmental Assessment. "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b).

### WILD FREE-ROAMING HORSES AND BURROS ACT

122.   In 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. §§ 1331 *et seq*.

123.   Congress delegated to the Secretary of Agriculture and the Secretary of the Interior jurisdiction over all wild free-roaming horses and burros "for the purpose of management and protection." *Id.* § 1333(a). The Wild Horse Act directed the agencies to protect and manage these animals "as components of the public lands" and "in a manner that is designed to achieve and maintain a thriving natural ecological balance" on those lands. 16 U.S.C. § 1333(a). The agencies implement the Wild Horse Act in part by establishing Forest Service wild horse territories ("WHT") or BLM herd management areas ("HMA") and then setting appropriate management levels ("AML") for the wild horse populations within each area. 16 U.S.C. §§ 1332(c), 1333(b)(1).

124.   The Forest Service, as an agency within the Department of Agriculture, is tasked with managing wild horses on the designated WHTs on public lands of the National Forest System under its jurisdiction. 36 C.F.R. § 222.60.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

125.    If USFS determines, based on reliable information, that there is an "overpopulation" of wild horses on public land, and also determines that the removal of "excess" animals is *necessary*, the USFS is entitled to remove them.  16 U.S.C. § 1332(b)(2).  The agency can only take animals out of the herd who "*must* be removed from an area in order to preserve and maintain a thriving natural ecological balance and multiple-use relationship in that area."  *Id.* § 1332(f) (emphasis added).

126.    USFS's actions must be consistent with the authority and purpose of the Wild Horse Act, which states that USFS shall protect wild horses "from capture, branding, harassment or death."  16 U.S.C. § 1331.

127.    The Wild Horse Act also provides that "[a]ll management activities shall be at the minimal feasible level . . . in order to protect the natural ecological balance of all wildlife species which inhabit such lands, particularly endangered wildlife species."  16 U.S.C. § 1333.

128.    The Forest Service Manual ("FSM") provides that the Forest Service should "[c]onsult and cooperate with the organizations that may be affected or interested in providing for protection, management, determination of excess animals, and control of wild free-roaming horses and burros," FSM § 2261, including "in developing plans for removal of excess animals," *id.* § 2261.2, and should "[c]onsult and cooperate with" state wildlife agencies on plans to "remov[e] and/or destr[oy] excess animals," *id.* § 2261.31(2).

129.    The Forest Service recognizes that "[p]articipation of a well-informed public in management of wild horses and burros is desirable.  Participation often can be achieved through public meetings, contacts with organized wild horse and burro protection groups, local livestock associations, or organizations with scientific expertise or special knowledge of wild horses and burros, or by individual contact."  FSM § 2261.4.

### *NATIONAL FOREST MANAGEMENT ACT*

130.    The National Forest Management Act ("NFMA") requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a).

COMPLAINT

131.     USFS regulations implementing NFMA state that subsequent site-specific decisions on national forest system lands "must be consistent with the applicable [forest] plan," and, if not, "the responsible official may modify the proposed decision to make it consistent with the plan, reject the proposal, or amend the plan to authorize the action." 36 C.F.R. § 219.10.  This includes territory management plans that USFS adopts for wild horses in Devil's Garden and on other National Forest System lands.

## FACTUAL ALLEGATIONS GIVING RISE TO PLAINTIFFS' CLAIMS

### The Devil's Garden Wild Horse Territory

132.     The Modoc National Forest is currently guided by the 1991 Forest Plan for the Modoc National Forest ("1991 Forest Plan"), which was issued with an accompanying EIS.  The 1991 Forest Plan and accompanying EIS do not address or contemplate the sale of wild horses from Devil's Garden "without limitation," including to buyers for slaughter for human consumption.

133.     The Devil's Garden Plateau Wild Horse Territory covers almost 258,000 acres within the Modoc National Forest.  It is the largest wild horse territory managed by the Forest Service.

134.     The Devil's Garden Wild Horse Territory is jointly managed by the Forest Service and the BLM as a Joint Management Area and is currently governed by the Devil's Garden Plateau Wild Horse Territory Management Plan (the "2013 TMP"), issued in August 2013, along with an accompanying Final EA, Record of Decision, and a Finding of No Significant Impact ("FONSI").

135.     Wild horse territory management plans, like the 2013 TMP, shall address "plans for the removal or disposal of excess animals," FSM § 2263.1; "are to conform with the Forest land and resource management plans" and "[i]nclude[] . . . means for removal and/or disposal of excess animals," *id.* § 2263.11; must be in "compliance with the . . . Forest land and resource management plans," *id.* § 2263.1; "describe desired population level, *detailed management practices*, *interagency coordination*, scheduling, and monitoring requirements," *id.* § 2260.5 (emphases added); and must include interagency "agreement on inventory, desired population level,

determination of excess animals, *planning*, *management*, *protection*, *control*, capture methods, and responsibility for initiating action." *Id.* § 2261.1 (emphases added).

136.    The 2013 TMP set the plan for management of wild horses in Devil's Garden for the next fifteen to twenty years.  The 2013 TMP included an "excess" horse determination and set a five-year gather and removal plan to begin in October 2013.

137.    However, neither the 2013 TMP, nor its accompanying EA, FONSI, and Record of Decision addresses or contemplates USFS selling wild horses "without limitation," including to buyers who may send horses on to slaughter for human consumption.

138.    The 2013 TMP does not analyze the impacts and any feasible alternatives to selling wild horses "without limitation."

139.    The 2013 TMP does not even mention sales of wild horses.

140.    The EA issued with the 2013 TMP states that

> [e]xcess wild horses removed from the WHT would be placed as follows: a. The first priority would be to place excess wild horses in private care through adoption or sale to qualified individuals. Authorized agency personnel would be responsible for adoption compliance and title transfer of these animals.  b. The second priority would be to place excess animals that are not adopted or sold in approved long-term holding pastures or sanctuaries. Authorized agency personnel would be responsible for ensuring the animals are cared for in a safe and humane manner. … Most animals not immediately adopted may be sent to long-term holding pastures located in the Midwest. Impacts to horses from being adopted or sent to long-term holding (LTH) are similar to those already described. However, animals sent to long-term holding can be transported a maximum of 24 hours. . . .

*Id.*

141.    According to the 2013 EA, wild horses from Devil's Garden could be adopted, sold, or placed into long-term holding pastures.  While the agency cursorily addressed the disposition of wild horses in the 2013 EA and what impacts could occur to wild horses who are adopted or placed in long-term holding pastures, it did not address impacts to wild horses who are sold (with or without limitation).  It also never mentioned the possibility that these horses could be sold into

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

commercial production with the near certainty that they would end up in slaughterhouses and become food for humans.

142.   The EA for the 2013 TMP also purported to respond to multiple public comments observing that the EA must include an economic analysis for the wild horse gather plans, including costs associated with the captures, short- and long-term holding, and adoption preparations, but it is not clear where in the EA the costs of the proposed action were analyzed.  There was no economic analysis concerning sales of wild horses "without limitation."

143.   The FONSI for the 2013 TMP stated that "[d]isposition of older animals that are gathered [from Devil's Garden] will be consistent with *law*, regulations *and policy*." (Emphases added).

144.   In January 2014, responding to an administrative appeal challenging the 2013 TMP and the related NEPA documents, USFS again stated that the "[d]isposition of older animals that are gathered [from Devil's Garden] will be consistent with *law*, regulations *and policy*." (Emphases added).

145.   Later in 2014, a lawsuit was brought challenging the 2013 TMP and related NEPA documents for failure to explain the USFS's removal of more than 23,000 acres from the Devil's Garden wild horse range.  In September 2017, the U.S. Court of Appeals for the District of Columbia Circuit ruled in favor of the plaintiffs in that lawsuit, holding that the Forest Service arbitrarily and capriciously eliminated this middle section of land from the Devil's Garden WHT. The D.C. Circuit "vacate[d] the Service's exclusion of the Middle Section territory and the related Finding of No Significant Impact, and direct[ed] the district court to remand to the Service for further consideration consistent with this decision."  *American Wild Horse Preservation Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

### The Forest Service's Longstanding Policy Prohibiting Sales of Wild Horses "Without Limitation"

146.   As stated in the 2013 TMP, for decades, the management plans for the Devil's Garden wild horses have "serve[d] to document the cooperation and working relationship between

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

the Modoc National Forest (MDF) and the BLM.  Generally, the BLM has been responsible for the operational work of gathering, holding and disposition of captured animals. The MDF has been responsible for planning, environmental analysis, monitoring and financing, and supplying the equipment and manpower necessary to assist in these efforts."

147.     The 2013 TMP also states that an April 2013 Memorandum of Understanding between BLM and the Modoc National Forest designated the Modoc National Forest as the lead agency for administering the wild horse program in Devil's Garden, but, the 2013 TMP did not disclose any changes in any prior policy or practice with respect to managing those wild horses, or conflicts in management policy between BLM and USFS, that might result from designating Modoc National Forest as the "lead" agency in the joint management relationship.

148.     The Forest Service is dependent on BLM in the implementation of its wild horse program, including adoptions and sales of wild horses.  As the Forest Service recently stated in a separate legal action over the Devil's Garden wild horses, when managing wild horses jointly with BLM, "the Forest Service is subject to all of the Congressional limitations and prohibitions placed on BLM – *e.g*., the prohibition on destruction of excess horses, *sale without limitations*, etc."  Fed. Defs.' Mem. in support of Opp. and Cross-Mot. for Summary J. at 7 (ECF No. 51-1, April 18, 2018) (emphasis added), *Devil's Garden Preservation Group, et al., v. McAdams, et al.*, Case No. 2:17-cv-02185-MCE-KJN (E.D. Cal.).

149.     The Forest Service and BLM "are not permitted to humanely destroy healthy, unadopted horses or conduct any sale that ultimately results in their destruction."  *Id*. at 8 (citing Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235, 128 Stat. 2130, 2399 (2014) ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products.")).

150.     For decades, BLM has included in all wild horse adoption and sale forms a statement requiring the adopter or purchaser to certify that s/he will not kill the horse to be used for human

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

consumption, nor will s/he transfer ownership to anyone who would kill the horse for such commercial purposes.

151.   Likewise, for decades, the Forest Service has required anyone adopting or purchasing a wild horse to sign a statement certifying that "I will provide humane care for such animals and will not sell or transfer ownership of any such animals that I purchase to any person or organization that intends to resell, trade, or give away such animals for processing into commercial products.  Additionally I certify that I will not violate either section of the California Penal Code [§§ 598c and 598d]."[1]

152.   USFS's wild horse adoption form also prohibits violating California Penal Code section 598d.[2]

153.   Under California anti-cruelty law, "it is unlawful for any person to possess, to import into or export from the state, or to sell, buy, give away, hold, or accept any horse with the intent of killing, or having another kill, that horse, if that person knows or should have known that any part of that horse will be used for human consumption." Cal. Penal Code § 598c(a).  This state criminal prohibition on the sale or transfer of horses to be killed for human consumption applies not only to federally-protected wild horses, but more broadly to "any equine, including any horse, pony, burro, or mule."  Cal. Penal Code § 598c(b).

154.   After the California State Legislature enacted Penal Code § 598c in 1998, BLM and Forest Service field offices in California incorporated the California state law prohibitions into their adoption and sale forms. For all agency actions in California, the Forest Service and BLM have required, and continue to require, wild horse purchasers to certify that they will not violate Cal. Penal Code §§ 598c and 598d, as reflected in the Forest Service's sale and adoption forms.

---

[1]https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd597076.pdf?fbclid=IwAR0JEpnjfiuCeYN4JNjPi0w1JD0fHvWNgxx5__C72uU2-FhUf7mh-5WawAw
[2]https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd597075.pdf?fbclid=IwAR2OABB3P2Wb_IY29WehUSgJW45AeKenbrVAiaJQ-xWGMR-5HvzMp0iwouY

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

155.   Because for decades both BLM and the Forest Service have refused to sell horses "without limitation," any wild horses that could not be adopted or sold with limitation were placed in long-term holding facilities, rather than being sold to kill buyers and into the slaughter pipeline.

156.   Under a 2004 Amendment to the Wild Horse Act, BLM and the Forest Service may sell excess horses of more than ten years of age or that have been offered unsuccessfully for adoption at least three times, "*without limitation*, including through auction to the highest bidder, at local sale yards or other convenient livestock selling facilities . . . ."  16 U.S.C. § 1333(e) (emphasis added).

157.   Because the sale of America's wild horses in a way that risks them being sold into slaughter for human consumption is contrary to law and the strong stated public policy behind the Wild Horse Act, Congress and the relevant agencies have always treated the 2004 Amendment so that "without limitation" did *not* include sales that would result in horses being sold for human consumption.  That is, despite the 2004 amendment to the Wild Horse Act authorizing the sale of wild horses "without limitation," Congress has repeatedly rejected implementation of that effort with respect to sale of horses for slaughter by blocking Department of Interior appropriations for it. *See, e.g.,* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31 ("Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of [BLM] or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products")*.*

158.   Based on the strong public policy behind the Wild Horse Act, as well as overwhelming public opinion opposed to the sale of wild horses for slaughter, BLM has continued to adhere to its pre-2004 approach of only selling horses "with limitations."

159.   In 2014, BLM adopted and issued Instruction Memorandum 2014-132, which "outlines policies and procedures for the Wild Horse and Burro (WH&B) Sale Program." It states that "[t]his policy was developed to provide additional assurances that *animals will not be processed into commercial products*." (Emphasis added.)  This memorandum governs BLM's sale

of excess wild horses, and, pursuant to contractual agreements authorizing BLM to oversee USFS's wild horse sales, has applied to the sale of all Forest Service wild horses since 2014.

160.    The Forest Service has followed BLM's policy of ensuring that Forest Service wild horses were sold only "with limitations," and requiring all buyers of wild horses to certify that no horse will be killed for commercial slaughter or transferred to anyone who would slaughter it for human consumption.  The Forest Service has also followed BLM's policy of ensuring that no purchasers of wild horses were in violation of California Penal Code sections 598c and 598d.

161.    During the litigation over the 2013 TMP, the Forest Service commissioned an internal working group to consider options for achieving the "appropriate management level" (the number of horses the agency deems to be the proper amount to maintain a "thriving natural ecological balance") in the Devil's Garden WHT.  One option considered internally by the working group was "Sales Without Limitation," which the working group concluded was *not* "consistent with the [2013 TMP] and [1991] Forest Plan" and *would* require "[a]dditional NEPA" review.  The working group concluded that if USFS elected to pursue sales without limitations, "100% of the animals sold would likely end up slaughtered," a "[h]uge public outcry can be expected," "Congress [is] likely to react by placing a rider on the Forest Service's appropriations [similar to BLM]," the "Forest Service [is] highly likely to end up with very black eyes and unceasing scrutiny," and this approach "[m]ay be contrary to a California [s]tate [l]aw [that] prohibits knowingly selling a horse for slaughter."

162.    In April 2016, the Forest Service's internal working group circulated to Forest Service staff a draft implementation document for the 2013 TMP. This document once again considered the option of "Sale Without Limitation (*Slaughter*)" (emphasis added), but explained that this approach has "not been implementable due to enormous public controversy."   The document concluded that "using [this] tool[]" would: "[r]equire additional environmental analysis to amend the [2013 TMP];" "[l]ead to enormous public controversy and lengthy litigation;" and "[r]isks Congressional limitations on the Forest Service's budget appropriations."   The document

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

once again concluded that this approach is *not* "consistent with the [2013 TMP] and [1991] Forest Plan" and *would* require "[a]dditional NEPA" review.

### The Forest Service's Abrupt Change in Policy to Allow Sales "Without Limitation" and to Slaughter

163.    The Forest Service is now removing additional "excess" wild horses from Devil's Garden, based on the EA and FONSI issued for the 2013 TMP that the D.C. Circuit Court held did not comply with NEPA.  The Forest Service has announced that will sell some of those horses "without limitation," a radical policy reversal coming after its internal working group specifically recognized that such a policy would be inconsistent with existing planning documents, may violate California state law, would require additional NEPA review, and would be enormously controversial and risky.

164.    In July 2018, the Forest Service issued a "Supplemental Information Report for the Devil's Garden Plateau Wild Horse Territory Environmental Assessment, Decision Notice, and Management Plan (September 2013)."  The Supplemental Information Report ("SIR") "provide[d] a review of [the] 2013 Environmental Assessment [accompanying the 2013 TMP] to determine whether it need[ed] to be supplemented prior to on-the-ground gather activities."

165.    "Per Forest Service Handbook (FSH) 1909.15, Section 18.1, a SIR is not a NEPA document and cannot be used to fulfill the requirements for a supplemental EA.  A SIR cannot repair deficiencies in the original environmental analysis or documentation, nor can it change a decision."

166.    The SIR did not mention that the agency would depart from, had considered departure from, or had analyzed effects of departing from its longstanding policy and practice of only selling wild horses "with limitations" that would prohibit slaughtering horses for commercial purposes.

167.    Instead, the SIR noted that "[t]he Forest Service has generally relied on the BLM expertise or private contracted services for operational management of individual [wild horse and burro] herds, including: gathers, removals, transport, holding facilities, animal care, *adoption and*

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

*sale events.*" (Emphasis added.)  This cursory statement is the *only* reference to sales of wild horses in the entire SIR.

168.    The Forest Service concluded in the SIR that "potential effects from the planned 2018/2019 gather(s) . . . are sufficiently analyzed within the scope of the original proposed action in [the] 2013 environmental analysis," so no NEPA review was needed.

169.    The Forest Service did not provide an opportunity for notice and public comment or an opportunity for administrative review of the SIR.

170.    Also in July 2018, the Forest Service issued an "Updated Excess Wild Horse Determination," in which Defendant McAdams found an excess of 1,000 adult wild horses and their foals had to be removed from Devil's Garden.  That document specifically stated that the Defendant "accounted for "agreements to gather, hold and place excess animals; and [ ] other placement services through contracts and/or agreements," and that "excess horse placement capability" is a consideration that "*need[s] to be included*" in making an excess determination. (Emphasis added.)

171.    The document also stated that "[t]he desired placement of all horses is through adoptions and sales to avoid putting horses in long-term holding."  However, there was no mention that the agency would depart from, had considered departure from, or had analyzed effects of departing from its longstanding policy and practice of selling wild horses "with limitations" that would prohibit slaughtering horses for commercial purposes.

172.     The Forest Service did not provide an opportunity for notice and public comment or an opportunity for administrative review of the Updated Excess Wild Horse Determination.

173.    Both the 2018 SIR and the 2018 Updated Excess Wild Horse Determinations are linked to and founded on the 2013 EA and FONSI for the 2013 TMP that were subject to legal challenge and found in 2017 to be in violation of NEPA.

174.    Defendants have never re-issued amended, corrected, or revised the 2013 NEPA documents to address the legal faults already determined by a federal appellate court.

175.    On October 4, 2018, a Forest Service official (Ken Sandusky) stated to the media that any wild horses removed from Devil's Garden that are not adopted or sold "with limitations" would be sold "without limitation" because, in the agency's Forest Service's view, "unlimited sale [is] the only fiscally responsible option."  Mr. Sandusky also acknowledged that this approach is unprecedented and stated that "[b]asically everything we're doing is new."

176.    The Forest Service did not provide an opportunity for notice and public comment or an opportunity for administrative review of any facts the agency considered or relied on in determining, for the first time ever, that "unlimited sale [is] the only fiscally responsible option."

177.    Although the Forest Service Manual and other documents require interagency coordination on wild horse management, especially between the Forest Service and BLM, and although the Forest Service and BLM jointly manage the Devil's Garden wild horses, USFS has never disclosed whether BLM is aware of the Forest Service's policy change, whether BLM ever was consulted about or concurred with the new policy, and how the policy change may impact their interagency operations.

178.    An agency like the Forest Service has a duty to explain a departure from precedent and prior norms by clearly providing its reasons and basis for its departure, to enable the public and reviewing court to judge whether the agency's action is consistent with its mandate.  This is true when an agency rescinds an existing rule, applies a standard inconsistently, or departs from longstanding practice without supplying a reasoned analysis for its change of course.

179.    On October 9, 2018, the Forest Service began rounding up and removing horses from Devil's Garden.

180.    That same day, Senator Dianne Feinstein of California sent a letter to the Forest Service raising concerns "that many of these animals will end up being sold to slaughterhouses." She also asked the agency to respond to the following question: "Can the Forest Service certify that no horses that are sold will be transferred to third-party buyers who may end up slaughtering the animals for commercial use?"

181.    On October 15, 2018, twenty-three members of the California State Legislature submitted a letter to the Forest Service urging it "to take immediate action to halt the wild horse roundup in the Modoc National Forest" because "[t]his could very well mean that many of these horses will end up being sold to slaughter plants." "Republican and Democratic administrations have respected federal and state law's clear intent to prevent the sale of federally-protected wild horses for slaughter by ensuring that the [Forest Service] maintained a no-slaughter policy for the much smaller number of federally-protected wild horses and burros it manages." The signatories requested that the Forest Service halt its action until the agency can "[p]rovide credible assurances and follow up with evidence that no wild horses from the Devil's Garden Wild Horse Territory that are sold will wind up slaughtered."

182.    Although no horse slaughter plants operate in the United States, some American horses are purchased at livestock auctions in the U.S. by middlemen known as "kill-buyers," who transport the horses across the border and sell them to commercial slaughter facilities in Canada and Mexico. Those commercial slaughter facilities make horse meat products that are sold as food for people.  This is why the Forest Service's own internal working group concluded that "100% of the animals sold would likely end up slaughtered" in the event that the Forest Service sells excess wild horses "without limitation."

183.    Defendant Moore wrote in an October 10, 2018 published letter that Devil's Garden wild horses "that do not get adopted will be offered for limited sales. With these sales, we will include stipulations that prohibit buyers from using horses for food consumption.  We also include requirements for adequate space and healthy accommodations for the purchased animals. In other words, we are taking definitive steps to ensure humane treatment.  This is the last resort, so every effort is being made to encourage adoption and limited purchase of the gathered horses.  *After that, the only remaining path for the U.S. Forest Service is to pursue unlimited sale without restrictions.*" (emphasis added.)[3]

_____

[3] https://www.redding.com/story/opinion/2018/10/10/forest-service-wild-horse-plan-humane-good-environment/1595303002/

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

COMPLAINT

184.    In an October 16, 2018 press release, Defendant Moore is quoted as stating: "We are nearing the point where the environmental degradation is irreversible, and we need to take immediate action."[4]   Defendants' public statements are drawing a false dichotomy between removing excess wild horses from public lands, and selling them "without limitation," to buyers who will slaughter them for human consumption.  That ignores what USFS and BLM have a policy of doing, and have done without exception for decades: transfer the removed wild horses who are not adopted to long-term holding facilities.

185.    On October 12, 2018, the Forest Service "extended the timeline for wild horses to be adopted or sold with limitations." "The new timeline will be a total of 90 days from when the gather started on Oct. 10."  The press release stated that "[i]t will take approximately thirty days to gather and process one thousand horses and the adoption and sale period will run for sixty days after that."  Based on this press release, it is Plaintiffs' understanding that the Forest Service may begin selling wild horses "without limitations" as early as January 9, 2019.

## CAUSES OF ACTION

### COUNT ONE
**Violations of the Administrative Procedure Act (APA)**
*All Plaintiffs v. All Defendants*

186.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

187.    The Forest Service has never engaged in any notice-and-comment decision-making concerning the possibility of selling excess wild horses "without limitation."

188.    If a federal agency such as the Forest Service implements a new policy that deviates from the status quo, the new policy is deemed arbitrary or capricious unless the agency displays awareness that it has changed its policy and provides a reasoned explanation in the decision-making record for the change and why it believes the new policy is better than the previous policy.

---

[4] https://www.fs.usda.gov/detail/modoc/news-events/?cid=FSEPRD599963

189.    By reversing the Forest Service's longstanding policy and practice concerning the disposition of excess wild horses, without supplying any legally coherent, non-arbitrary justification for its decision, and by selling the wild horses "without limitation" knowing that they likely will be slaughtered for human consumption, the Forest Service has violated the APA.

190.    By failing to conduct any notice-and-comment decision-making process and adopting a drastically different policy to selling excess wild horses without soliciting any public input in the decision and by announcing the agency's decision through emails, press releases, and media statements, the Forest Service has violated the APA.

191.    By jettisoning the longstanding policies and practices concerning the sale of excess wild horses by BLM—the agency from which the Forest Service admittedly seeks guidance on managing all wild horses and burros, including managing sales and adoptions, and with which the Forest Service jointly manages the Devil's Garden wild horses—the Forest Service has acted arbitrarily, capriciously, and in contravention of the APA.

192.    By failing to consider and evaluate as part of a public decision-making process whether selling excess wild horses without limitation will violate California Penal Code § 598c, the Forest Service acted arbitrarily, capriciously, and in violation of the APA.

193.    Because Defendants' sale of wild horses without limitation violates the language and the spirit of governing law in an arbitrary and capricious manner, Defendants have violated their duties under the APA.

194.    By authorizing wild horse sales without limitations, Defendants have abused their discretion and acted arbitrarily and capriciously and not in accordance with law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C), and (D).

195.    Defendants' conduct is the legal and factual cause of Plaintiffs' injuries alleged in this Complaint.

196.    For all of these reasons, the Forest Service's policy change allowing it to sell excess wild horses "without limitation" must be set aside as an agency action that is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

### COUNT TWO
### Violations of NEPA and the APA
*All Plaintiffs v. All Defendants*

197.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

198.    By failing to revise and re-issue for public notice and comment, subject to administrative review, the 2013 EA and 2013 FONSI after the judicial determination that they did not comply with NEPA, and to the extent that the agency is relying on those unlawful, now-vacated NEPA analyses to avoid NEPA review of the change in policy regarding wild horse sales "without limitations," the agency has violated NEPA and its implementing regulations.

199.    Even if the 2013 NEPA decision documents had not been judicially vacated, by applying this highly controversial policy regarding wild horse sales "without limitations" to actions under the 2013 TMP without conducting amended NEPA review for the 2013 TMP, the agency has violated NEPA and its implementing regulations.  NEPA requires both that an EA specify the need for a proposed action, 36 C.F.R. § 220.7(b)(1), and that the agency study, develop, and describe appropriate alternatives.  Defendants did not study, develop, and describe alternatives to selling wild horses without limitation because that policy change was never contemplated in the 2013 EA or at any time since in any NEPA documents.

200.    In the history of its management plans and actions, USFS has never issued an EA or an EIS addressing sales without limitation for the Devil's Garden wild horses, and thereby has violated NEPA and its implementing regulations.

201.    By failing to examine the possibility of selling excess wild horses "without limitation" under NEPA, including by analyzing all potential impacts, and positive and negative effects, of such a highly controversial action, that is precedent-setting for the Forest Service, and that may violate state penal law, and by not analyzing alternatives to that action, the agency has not taken the requisite "hard look" at the consequences of its policy change, and has not publicly

evaluated the relevant issues and opposing viewpoints, and thereby has violated NEPA and its implementing regulations.

202.    Because the policy change implicates multiple CEQ significance factors, an EIS was required to be prepared. By failing to prepare an EIS for this highly controversial, precedent-setting decision that will likely result in significant impacts to federally-protected wild horses and that will also likely violate California Penal Code §§ 598c and 598d (and directly implicate various NEPA "significance" factors"), the Forest Service has violated NEPA and its implementing regulations.

203.    By failing to ensure that "high quality" information was made "available [to] officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b), and by failing "to the fullest extent possible . . . [to] encourage and facilitate public involvement in decisions which affect the quality of the human environment," *id.* § 1500.2, the Forest Service acted in a manner that is arbitrary and capricious, an abuse of discretion, and contrary to law, and in violation of NEPA.

204.    Each and every one of these actions and omissions has injured Plaintiffs as set forth in this Complaint.

205.    For all of these reasons, the Forest Service's recent decision to sell excess wild horses without limitation violated NEPA and its implementing regulations, and must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

## COUNT THREE
### Violations of the Wild Horse Act and the APA
*All Plaintiffs v. All Defendants*

206.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

207.    Because USFS's policy change authorizing the sales of wild horses "without limitations" will result in the slaughter of these horses for human consumption, it is by definition

COMPLAINT

not the "minimum feasible level" of management and care for wild horses, which the Wild Horse Act mandates that the agency provide.

208.    By adopting a new policy that will result in the wild horses being sold into slaughter for human consumption, Defendants have violated their duties under and the Congressional purpose and spirit of the Wild Horse Act.

209.    Each and every one of these actions has injured and damaged Plaintiffs as set forth in this Complaint.

210.    For these reasons, the Forest Service's recent decision to sell excess wild horses without limitation violated the Wild Horse Act, and must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

## COUNT FOUR
### Violations of the National Forest Management Act and the APA
*All Plaintiffs v. All Defendants*

211.    Plaintiffs hereby re-allege and incorporate by reference herein, as if set forth in full, the allegations set forth above in all paragraphs.

212.    Defendants' own directives in the Forest Service Manual provide that the 2013 TMP was required to address "means for removal and/or disposal of excess animals," *id.* § 2263.11; was required to describe "detailed management practices" and "interagency coordination," *id.* § 2260.5; and was required to include interagency "agreement on inventory, planning, management, protection, and control," *id.* § 2261.1.

213.    The Forest Service failed to present detailed information on disposal of excess animals, thereby preventing the public and interagency partners from knowing and providing comments on the Forest Service's determination to sell wild horses without limitation.  Moreover, there is no record information that the Forest Service ever consulted or coordinated with BLM, or that BLM ever agreed with the Forest Service, regarding the policy change to authorize wild horse sales without limitation, including sales of the Devil's Garden wild horses, which BLM and the Forest Service jointly manage.

214.    Because USFS's policy change was not contemplated in either the 1991 Forest Plan or the 2013 TMP, because detailed information regarding disposal of wild horses through sales without limitations should have been, but was not, included in the 2013 TMP, and because the Forest Service has not initiated a process to amend the 2013 TMP to address the policy change and any impacts to interagency joint management, the Forest Service's actions violate its own directives as set forth in its Forest Service Manual, and the agency's actions do not comport with the governing planning documents, thereby violating the NFMA and its implementing regulations.

215.    Each and every one of these actions has injured and damaged Plaintiffs as set forth in this Complaint.

216.    For these reasons, the Forest Service's recent decision to sell excess wild horses without limitation violated the NFMA, and must be set aside as an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment against Defendants and:

1.    Declare that Defendants, by authorizing the sale of wild horses "without limitation," have violated the National Environmental Policy Act, the Wild Horse Act, the National Forest Management Act, the Administrative Procedure Act, and relevant implementing regulations;

2.    Set aside the challenged agency policy and related agency decision documents for failing to comply with federal law and the agency's own directives and procedures, and remand the decision for further consideration by the Forest Service;

3.    Enjoin Defendants from taking any further actions to implement the challenged policy until the agency has fully complied with all applicable laws;

4.    Enjoin Defendants to restore the status quo policy only allowing the sale of wild horses "with limitation," until Defendants complete lawful rulemaking or take lawful agency action altering that policy;

5.      Award Plaintiffs their attorneys' fees, expenses, and recoverable litigation costs reasonably incurred in connection with the commencement and prosecution of this action; and

6.      Grant Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:  October 25, 2018                    SCHIFF HARDIN LLP


By:    */s/ Bruce A. Wagman*
        Bruce A. Wagman (SBN 159987)
        bwagman@schiffhardin.com
        One Market
        Spear Street Tower, Suite 3100
        San Francisco, CA  94105
        Telephone:      415.901.8700
        Facsimile:      415.901.8701

        Molly L. Wiltshire (seeking *pro hac vice* admission)
        mwiltshire@schiffhardin.com
        233 S. Wacker Drive, Suite 7100
        Chicago, IL 606006
        Telephone:   312.258.5500
        Facsimile:   312.258.5600

        *Attorneys for Plaintiffs* Front Range Equine Rescue,
        The Humane Society of the United States, Marin
        Humane, Cindy Machado, Humane Society of the
        Sierra Foothills, Rosemary Frieborn, and Return to
        Freedom

        Kimberly D. Ockene (seeking *pro hac vice* admission)
        kockene@humanesociety.org
        Jonathan R. Lovvorn (SBN 187393)
        jlovvorn@humanesociety.org
        1255 23rd Street NW, Suite 450
        Washington, DC 20037
        Telephone:    202.452.1100
        Facsimile:    301.548.7700

        *Attorneys for Plaintiff* The Humane Society of the
        United States